UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

VLADIMIR GUSINSKI,

        Plaintiff,

    - against -

SAGI GENGER,

        Defendant.

-------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 4506 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/30/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiff Vladimir Gusinski seeks to hold defendant Sagi Genger personally liable for a defaulted multi-million dollar loan extended to AG Holdings Company ("AG Holdings"), a now insolvent Canadian corporation. Gusinski alleges that Genger, acting as the alter ego of AG Holdings, intentionally depleted the company's assets through a series of self-interested and fraudulent transactions in order to render it incapable of repaying the loan. Genger denies participating in the contested transactions or exercising control over AG Holdings during the operative time period, and has filed a Third-Party Complaint for indemnification and contribution against other corporate actors. Pursuant to Rules 14(a)(4) and 21

1

of the Federal Rules of Civil Procedure, Gusinski now moves to sever Genger's

third-party claims from the underlying action.  For the reasons set forth below,

plaintiff's motion is granted.

## II.     BACKGROUND[1]

### A.     The Loan to AG Holdings

On July 24, 2001, Gusinski extended a loan for $2.5 million ("Loan")

to AG Holdings, a Canadian entity involved in the real estate and development

business.[2]  The Loan was initially secured by a promissory note and a pledge by

AG Real Estate Partners L.P. ("AG Real Estate"), the former parent of AG

Holdings.[3]  The pledge agreement granted Gusinski

> a security interest in all shares in AG Holdings beneficially
> owned by AG Real Estate, whether currently or in the
> future[;] . . . prohibit[ed] AG Real Estate from transferring
> or encumbering its shares in AG Holdings without the
> express written consent of plaintiff [; and] . . . provide[d]
> that AG Real Estate shall pay any distributions made by
> [AG Holdings] to plaintiff.[4]

---

[1]     All facts are drawn from the Amended Complaint ("Compl.") and
from the Answer & Third-Party Complaint ("Ans. & Third-Party Compl.").  Only
facts relevant to this motion are included.

[2]     *See* Compl. ¶¶ 9, 11.

[3]     *See id.* ¶ 10.

[4]     *Id.* ¶¶ 13-14.

2

In February 2002, AG Holdings used the Loan proceeds to execute a note to its subsidiary, AG Properties Company ("AG Properties"), for the purchase of two real estate properties in Canada ("Sub-Loan").[5]  AG Properties subsequently resold the two properties and, in 2005, used the proceeds to invest in Riverside Properties (Canada) LP ("Riverside Properties"), a Delaware based limited partnership which owned valuable real estate in Canada.[6]  "Accordingly, AG Holdings' chief asset was its ownership of AG Properties, which, indirectly or directly owned multi-million dollar real estate in Canada," and from which it was to receive substantial principal and interest payments on the Sub-Loan.[7]

In 2005, Genger signed a written assurance that "*all* funds received by AG Properties or Riverside General Partner would be set aside for repayment of the [L]oan" ("Assurance").[8]  According to Gusinski, the promissory note, pledge,

---

[5]      *See id.* ¶ 16.  At the time, AG Holdings held half of the interests in AG Properties, though it purchased the remaining half in 2005 to become sole owner. *See id.* ¶ 15.

[6]      *See id.* ¶¶ 16-17.  Riverside General Partner, a Delaware limited partnership, was the general partner of Riverside Properties. *See id.* ¶ 17.

[7]      *Id.* ¶ 19. The principal amount of the Loan exceeded 3.8 million dollars, with an interest rate of 6.5 percent per annum.  Payments were scheduled to begin in 2003, with the principal outstanding balance due in 2011. *See id.*

[8]      *Id.* ¶ 21 (emphasis added).  The Assurance provides that the funds to be set aside include those received in connection with AG Properties' investment in Riverside Properties. *See id.* ¶ 22.

and Assurance "formed a collective obligation" whereby the following entities were directly or indirectly obliged to repay the Loan: AG Holdings, through the promissory note; AG Real Estate, through the pledge; and AG Properties and Riverside General Partner through the Assurance.[9]

### B.    The Allegedly Fraudulent Transactions

Gusinski alleges that, "in 2004 and 2005, Defendant assumed management positions and began to exercise domination and control over AG Holdings, AG Properties, AG Real Estate, and Riverside General Partner."[10] Gusinski claims that Genger thereafter "made all decisions on their behalf, and used his power over the corporations to further his own personal interests."[11] Specifically, Gusinski alleges that Genger, upon taking control of these entities, "embarked on a fraudulent scheme to render the Promissory Note, Pledge

---

[9]      *Id.* ¶ 23.  Specifically, Gusinski alleges that: AG Holdings was directly liable for the Loan; AG Real Estate was indirectly liable through its commitment to divert distributions from AG Holdings; and Riverside General Partner was indirectly liable under its agreement to set aside funds received in connection with Riverside Properties.  *See id.*

[10]      *Id.* ¶ 20.  Genger denies that he exercised domination or control over these entities, although he admits that he was named as officer of each of those entities and that he controlled Riverside General Partner subject to fiduciary duties to other investors.  *See* Ans. & Third-Party Compl. ¶ 20.

[11]      Compl. ¶ 49.  The Amended Complaint states that "at all relevant times [Genger] was a direct or indirect shareholder, director and officer of AG Holdings, AG Properties, AG Real Estate and Riverside General Partner."  *Id.* ¶ 48.

4

Agreement and Assurance worthless . . . [by] methodologically stripp[ing] AG Holdings of its main asset — its indirect ownership of multi-million dollar real estate in Canada through its subsidiary AG Properties."[12]

      *First*, in 2005, Gusinski argues that AG Properties was stripped of its cash reserves through a series of improper payments totaling over 1.5 million dollars to TPR Investment Associates ("TPR"), another company purportedly owned by the Genger, in return for consultancy services worth only half that amount.[13]  Because AG Properties was the only AG Holdings asset with any value, the alleged effect of the "scheme of siphoning money from AG Properties to TPR [was to] . . . preclude[] AG Properties from making any distributions or repaying its loan obligations to AG Holdings [, which in turn] . . . ensure[d] that AG Holdings would not be able to make payments to Plaintiff due under the [L]oan."[14]

      *Second*, Gusinski claims that Genger violated the terms of the pledge and further defrauded him in 2005 by transferring all of AG Real Estate's interests

---

[12]    *Id.* ¶ 24.  The referenced transactions are complex, prolific, and involve many different entities.  *See, e.g.*, Compl. at pp. 8, 11-12 (distilling the transactions through charts and graphs).  To simplify matters for purposes of this motion, I set forth only the broad contours of the allegations asserted in the parties' submissions.

[13]    *See id.* ¶ 25.

[14]    *Id.* ¶¶ 27-28.

in AG Holdings to 1650 Lincoln Trust ("Lincoln Trust"), a Canadian Trust overseen by AG Canadian Properties LLC and controlled by Genger.[15]  Gusinski contends that "the scheme rendered AG Real Estate unable to fulfill its obligations under the Pledge Agreement by diverting any cash it was entitled to receive from AG Holdings to another of Defendant's companies."[16]

*Third*, Gusinski alleges that Genger wrongfully converted the Sub-Loan into a non-redeemable capital contribution in 2006, thereby canceling AG Properties' repayment obligations to AG Holdings.[17]  Consequently, AG Holdings did not receive the scheduled interest and principal payments that would have allowed it to repay its obligation to Gusinski.[18]  *Fourth*, Gusinski alleges that, throughout 2005 and 2006, Genger employed similar tactics of converting loan obligations into equity for the purpose of diluting AG Properties' interests in Riverside Properties.[19]  The result was to "render[] AG Properties' unable to fulfill its monetary obligations to Plaintiff [;] . . . preclude[] AG Holdings from receiving any distributions from AG Properties which could have been used to repay the

---

[15]    *See id.* ¶ 29.

[16]    *Id.* ¶ 32.

[17]    *See id.* ¶ 33.

[18]    *See id.* ¶¶ 33-34.

[19]    *See id.* ¶¶ 35-42.

6

[L]oan;" and make worthless the shares of AG Holdings used as collateral to secure the Loan.[20]

## C.   Plaintiff's Claim

Based on these and other transactions, Gusinski posits that AG Properties' cash reserves and equitable assets were siphoned off among various entities controlled by Genger, all for inadequate consideration and with the effect of depleting any assets that should have been provided to AG Holdings to repay the Loan.  In 2008, AG Holdings failed to make scheduled payments on the Loan, and it went into default.[21]  Gusinski subsequently accelerated the Loan, and on December 22, 2009, obtained a judgment in the Supreme Court of the State of New York for the full amount plus interest — a total of $4,357,551.99.[22]  To date, no payment has been made.[23]

Gusinski now brings an action for fraudulent conveyance to obtain (1) injunctive relief to set aside and annul the conveyances made by AG Holdings to

---

[20]   *Id.* ¶¶ 33-40.  The Amended Complaint also alleges that Genger engaged in other questionable business transactions that "made no business sense," only furthered his own interests, and disregarded necessary corporate formalities. *Id.* ¶ 51.  *Accord id.* ¶¶ 50, 52-55.

[21]   *See id.* ¶ 2.

[22]   *See id.* ¶¶ 43-46.

[23]   *See id.* ¶¶ 43-47.

7

its subsidiaries; and (2) damages and restitution, including attorney's fees, for the losses he sustained as a result of the company's conduct.[24]  Gusinski also seeks to pierce the corporate veil in order to hold Genger personally liable for the Loan as the alter ego of AG Holdings and its subsidiaries.[25]  In response, Genger denies that he was the decision-maker during the relevant time period for any of the entities involved in the challenged transactions, and has filed a Third-Party Complaint against other corporate actors seeking indemnity and contribution.[26]

### D.     The Third-Party Complaint

Genger asserts that

> if it is found that (a) there was such a debt [owed to Gusinski], (b) AG Properties made fraudulent conveyances to TPR as alleged which frustrated the payment of AG Holdings' debt to Gusinski, (c) [Genger] was the *alter ego* of AG Properties at the time of the transfers in question, and (d) [Genger] is personally liable for such fraudulent conveyances by AG Properties, [Genger] brings these claims for indemnity and contribution against persons and entities that acted together to strip AG Properties of assets

---

[24]     *See id.* ¶¶ 4, 56-75 (pleading five causes of action based on fraudulent conveyance).

[25]     *See id.* ¶¶ 76-79 (pleading a cause of action under an alter ego theory).

[26]     Genger asserts that his Third-Party Complaint is also an affirmative defense. *See* Ans. & Third-Party Compl. at p.10. *Accord infra* Part IV.A.2 (rejecting Genger's argument that his third-party claims present an affirmative defense).

in September 2005.[27]

Genger names the following four defendants in the Third-Party Complaint: Arie Genger ("Arie Genger"), a resident of Florida;  Gilad Sharon, a resident of Israel; Lerner Manor Trusteeships Ltd. ("Lerner Manor"), incorporated in Israel; and Omniway Limited ("Omniway"), incorporated in Cyprus.[28]

The Third-Party Complaint alleges that Arie Genger, defendant's father, was the "sole director and controlling person" of AG Properties and AG Holdings during the operative time period.[29]  Sharon is named as the sole beneficial director of Lerner Manor and Omniway at all relevant times.[30]  Genger alleges that, before he assumed control of AG Properties but after the Loan, Arie Genger and Sharon colluded to funnel assets away from AG Properties to Lerner Manor and Omniway through international transactions supported by backdated and otherwise falsified documents.[31]

Specifically, the Third-Party Complaint asserts that, in 2002, Sharon and Arie Genger entered into an agreement whereby Sharon purchased half of AG

---

[27]     Ans. & Third-Party Compl. ¶ 89.  *Accord id.* ¶ 8.

[28]     *See id.* ¶¶ 90-93.

[29]     *Id.* ¶ 90.

[30]     *See id.* ¶¶ 90-93.

[31]     *See id.* ¶ 89.

Properties' stock in the form of a promissory note for 1.25 million dollars from Omniway.[32]  The following year, using backdated documents, they disregarded the Omniway note and substituted Lerner Manor as the fifty percent stockholder of AG Properties for the "bargain-basement subscription price" of twenty-five thousand dollars.[33]  In 2004, Lerner Manor was retroactively substituted (as of 2001) as half owner of Lincoln Trust and 3455 Rue Durocher Trust ("Durocher Trust"), another trust overseen by Arie Genger, for the stated consideration of ten dollars each.[34] "The intended design and practical effect of these paper transactions was to funnel proceeds from the [two] real estate investments [enabled by Gusinski's loan] to Gilad Sharon in derogation of the rights of others for reasons known only to [Arie Genger] and Sharon."[35]

The Third-Party Complaint alleges that after the two real estate investments were sold at a profit in 2004 and 2005, respectively, the majority of the proceeds were distributed to AG Properties or its subsidiaries.[36]  Arie Genger and Sharon then conspired to upstream a million dollars of those proceeds to AG

---

[32]     *See id.* ¶ 99.

[33]     *Id.* ¶ 101.

[34]     *See id.* ¶ 102.

[35]     *Id.* ¶ 105.

[36]     *See id.* ¶ 107.

Holdings, which used the funds to purchase Lerner Manor's purported stock

holding in AG Properties and its interests in the Lincoln and Durocher Trusts —

"all of which Lerner Manor had acquired without any semblance of adequate

consideration and all of which were papered up with phony documentation."[37]

According to Genger, these conveyances were responsible for AG Holdings'

subsequent default on the Loan.[38]

## III.   LEGAL STANDARD

A district court has broad discretion to "sever any claim against a

party."[39]  The court can exercise this right "[f]or convenience, to avoid prejudice,

or to expedite and economize."[40]  Nonetheless, "for reasons of efficient judicial

administration courts favor having only one trial whenever possible. Therefore, the

party moving for a separate trial has the burden of showing that [severance] is

---

[37]     *Id.* ¶ 108.

[38]     Genger also alleges that these conveyances deprived TPR of its "legitimate right to compensation upon the sale" of the two real estate properties, because it had provided primary financing for their original purchase. *Id.* ¶ 109.

[39]     Fed. R. Civ. P. 21.  *Accord New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1082 (2d Cir. 1988) ("The decision whether to grant a severance motion is committed to the sound discretion of the trial court.").

[40]     Fed. R. Civ. P. 41(b).  *Accord T.S.I. 27, Inc. v. Berman Enter., Inc.*, 115 F.R.D. 252, 254 (S.D.N.Y. 1987) (noting that severance is proper "when it will serve the ends of justice and further the prompt and efficient disposition of litigation" (citing *Wyndham Assoc. v. Bintliff*, 398 F.2d 614 (2d Cir. 1968))).

necessary to prevent prejudice or confusion, and to serve the ends of justice."[41]

When deciding a motion to sever, a district court should consider the following factors: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims."[42] "Severance requires the presence of only one of these conditions."[43]  Above all, the court must consider "principles of fundamental fairness and judicial efficiency."[44]

## IV.   DISCUSSION

### A.   Similarity of the Issues Presented

With respect to the first two factors, the claims set forth in the

---

[41]   *Buscemi v. Pepsico, Inc.*, 736 F. Supp. 1267, 1271 (S.D.N.Y. 1990).

[42]   *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig. ("In re Merrill Lynch")*, 214 F.R.D. 152, 154-55 (S.D.N.Y. 2003).

[43]   *Cestone v. General Cigar Holdings, Inc.*, No. 00 Civ. 3686, 2002 WL 424654, at *2 (S.D.N.Y. Mar. 18, 2002) (quotation and citation omitted).

[44]   Moore's Federal Practice 3d Ed. § 21.02[4] (2007). *Accord Wyndham Assoc.*, 398 F.2d at 619 ("There is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicative litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided.").

12

Amended Complaint and the Third-Party Complaint are "significantly different" so as to warrant a separate trial.[45]

### 1.    Factual Origins

Despite Genger's assertion that his third-party claims are based on "identical facts" as the underlying action,[46] the pleadings indicate that they "arise out of separate incidents by separate actors."[47]  On the one hand, the Amended Complaint references only transactions conducted by companies within the umbrella of AG Holdings, and "solely involves actions Defendant took after he assumed management" of these entities."[48]  Gusinski alleges that, under Genger's direction, AG Holdings and its affiliates engaged in fraudulent conveyances

---

[45]    *Lewis v. Triborough Bridge and Tunnel Auth.*, No. 97 Civ. 0607, 2000 WL 423517, at *2 (S.D.N.Y. Apr. 19, 2000) (noting that one of the factors in determining whether severance is appropriate is "whether the issues sought to be tried separately are significantly different from one another").

[46]    Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Sever Defendant's Claims Against All Third-Party Defendants ("Def. Mem.") at 3.

[47]    *Cestone*, 2002 WL 424656, at * 3 (granting separate trials where planitiffs both brought claims alleging sexual harassment by defendant's employees, but did not work at the same location or with the same people). *Accord In re Merrill Lynch*, 214 F.R.D. at 156 (finding severance appropriate where "[t]here are two sets of defendants and two sets of claims").

[48]    Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Sever Defendant's Claims Against All Third-Party Defendants ("Pl. Mem.") at 6.

*amongst themselves* in order to frustrate repayment of the Loan and to serve
Genger's personal interests.   On the other hand, the Third-Party Complaint
"relates to actions taken by the Third-Party Defendants from 2001 to 2005 before
Defendant assumed control and without Defendant's knowledge."[49]  Genger asserts
that third-party defendants "funnel[ed] proceeds" *from* AG Holdings and its
affiliates *to outside entities*, for reasons unknown and with the apparent effect of
enriching Sharon.[50]

Because the third-party claims involve different actors and refer to
different transactions, severance will not result in duplicative litigation or impede
the efficiency of pre-trial discovery.  Rather, severance will "avoid the specter of
exceedingly expensive and lengthy international discovery against third-parties"
whose acts cannot offset the determination of whether *defendant Genger* is liable
to plaintiff.[51]

## 2.    Legal Issues

Genger argues that the allegations set forth in the Third-Party
Complaint also constitute an affirmative defense to Gusinski's claims and must

---

[49]     *Id.*

[50]     Ans. & Third-Party Compl. ¶ 104.

[51]     Pl. Mem. at 2.

14

therefore be tried simultaneously.[52] "An affirmative defense is defined as 'a defendant's assertion raising new facts and arguments that, if true, will defeat the planitiff's or prosecution's claim, even if all allegations in the complaint are true.'"[53] According to Genger:

> if proven, the affirmative defense would clearly affect, if not eliminate any [of his] personal liability. Had [Arie Genger] not effectuated the illegitimate and fraudulent transfers to Gilad Sharon, AG Properties would undoubtedly have been able to provide its parent AG Holdings with sufficient funds to make the 2008 payments to [Gusinski] that AG Holdings could not in fact make.[54]

However, even assuming, *arguendo*, that Genger ultimately prevails on his third-party claims, only the *amount* or share of his obligation for the Loan — not the *fact* of his liability — would be affected.

Any fraud committed by third-party defendants is extrinsic to Gusinski's claim that Genger *personally* and *intentionally* depleted AG Holdings'

---

[52]   My conclusion that the third-party claims are independent and distinct from the underlying action undermines Genger's argument in support of consolidation, which rests on his belief that "the Third-Party Complaint and the affirmative defense arise out of precisely the same transactions, raise identical issues of fact and similar legal issues as pleaded, and require proof from the same witnesses and documents." Def. Mem. at 6.

[53]   *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (quoting Black's Law Dictionary 430 (7th ed. 1999)).

[54]   Def. Mem. at 5.

assets to avoid repaying the Loan. As Gusinski points out, "[a] finding that
Defendant engaged in a fraudulent transaction when he depleted AG Properties'
interests in Riverside in 2006, for example, would not be defeated by a finding that
in 2005, the Third-Party Defendants improperly siphoned money from AG
Properties."[55] Because Genger would be liable for his own culpable conduct,
whether or not third-party defendants participated in efforts to frustrate the Loan,
the third-party claims do not present an affirmative defense that must necessarily
be considered in tandem with Gusinski's claims.

To the contrary, the legal issues presented in the underlying claims for
fraudulent conveyance and alter ego liability are distinct from those in the third-
party claims for indemnification and contribution. Moreover, Gusinski seeks both
legal and equitable relief, while Genger seeks only damages. Consolidation would
only result in delay.

### B.    Settlement and Judicial Economy

Considerations of judicial economy also counsel in favor of
severance. The possibility of settlement would be furthered by severing Genger's
third-party claims. The Amended Complaint involves two private individuals who

---

[55]    Plaintiff's Reply Memorandum of Law in Further Support of
Plaintiff's Motion to Sever Defendant's Claims Against All Third-Party
Defendants at 4.

share "only a business relationship, [and] who have already agreed to take their dispute to a private mediator."[56]  Because the parties appear to prioritize professional efficiency and have already embraced the possibility of settlement, there is a reasonable likelihood that mediation may be successful.  In contrast, the Third-Party Complaint "raise[s] personal and political issues by bringing in Arie Genger, [Genger's] father, and Gilad Sharon, the son of the former Prime Minister of Israel."[57]  Indeed, Genger admits that he and his father "have been estranged for years and are on opposite sides of a number of lawsuits."[58]  Settlement of the third-party claims will likely be hindered by emotional and political considerations outside the scope of the instant dispute.

Judicial economy also favors severance because  resolution of Gusinski's claim will "limit or streamline the remaining issues" raised by Genger.[59] The Third-Party Complaint acknowledges that Genger will pursue his third-party indemnification and contribution claims *only if* he is found to be liable.  Genger

---

[56]     Pl. Mem. at 6-7.

[57]     *Id.*

[58]     Def. Mem. at 2.

[59]     *Lewis*, 2000 WL 423517, at *4 (citation and quotation omitted). *Accord United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir. 1993) ("Bifurcation . . . provide[s a] powerful legal tool[ ] which, by effectively isolating the issues to be resolved, avoid lengthy and perhaps needless litigation.").

17

can escape liability on Gusinski's claims — and eliminate the need for his third-party claims — by demonstrating that he did not exercise control over the Company during the relevant time period or that the contested transactions were not fraudulent.  Thus, unlike the majority of cases in which separate trials are granted, Genger's liability is not "derivative of the conduct and liability of another," but is in fact "a *predicate* for the imposition of liability" against third-party defendants.[60]  To this end, the Second Circuit has noted that severance is appropriate "where litigation of one issue may obviate the need to try another issue."[61]

## C.   Prejudice to the Parties

Moreover, consolidation of the claims would prejudice Gusinski. Resolution of the third-party claims is not necessary for the adjudication of Gusinski's claims, and subjecting him to the expense and delay of international discovery is wasteful and unfair — particularly as Gusinski has already waited

---

[60]     *Lewis*, 2000 WL 423517, at *4 n.2.

[61]     *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (quotation and citation omitted).  *Cf. Compania Embotelladra Del Pacifico, S.A. v. Pepsi Cola Co.*, 256 F.R.D. 131, 133 (S.D.N.Y. 2009) (rejecting severance where it "would do nothing to promote judicial economy, convenience, or fairness, but would instead render nugatory the substantial time, effort, and resources . . . already devoted to litigating the instant claims").

over a year to collect the judgment due on the Loan.[62]

Moreover, the transactions underlying the alleged fraud in both the Amended Complaint and the Third-Party Complaint are exceedingly complex, and likely to become conflated or confused by the jury.[63]   Consequently, consolidating the claims may increase Gusinski's burden of proof — instead of demonstrating that Genger engaged in improper conduct as the alter ego of AG Holdings, plaintiff will also have to effectively disprove Genger's claim that AG Holdings' default on the Loan is properly traceable to the actions of third-party defendants.

### D.   Evidentiary Proof

Finally, the claims do not depend upon the same evidentiary proof.[64]   The Amended Complaint seeks to prove that *Genger* improperly impeded payment of the Loan.  Thus, on plaintiff's case, "the witnesses will be Plaintiff and Defendant," both of whom reside in the United States, and the "documentary

---

[62]   *See, e.g.*, *In re Merrill Lynch*, 214 F.R.D. at 156 (granting severance and noting that "[d]iscovery burdens and associated expenses would operate expansively absent a severance").

[63]   *See, e.g.*, *Monaghan v. SZS 33 Assocs.*, 827 F. Supp. 233, 245 (S.D.N.Y. 1993) ("A district court may order separate trials to prevent the factfinder from being exposed to evidence admitted for the purpose of addressing one claim that would contaminate his mind regarding a different claim.").

[64]   *See, e.g.*, *Deajess Med. Imaging, P.C. v. Travelers Indem. Co.*, 222 F.R.D. 563, 564 (S.D.N.Y. 2004) (granting severance for claims relying on different evidence than the underlying action).

evidence will relate solely to the fraudulent transfers effected by Defendant through the corporations he owns and controls."[65]  By contrast, the dispositive question in the Third-Party Complaint is whether *Arie Genger* and *Sharon* engaged in fraud.  Trial of the third-party claims will require at least these foreign parties to appear as witnesses, and will depend on documentary evidence in possession of the foreign entities they directed.

## V.        CONCLUSION

For the foregoing reasons, Gusinski's motion to sever Genger's Third-Party Complaint is granted.  The Clerk of the Court is directed to close this motion [Docket No. 10].  A conference is scheduled for December 15, 2010 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
             November 29, 2010

---

[65]    Pl. Mem. at 8.

# - Appearances -

**For Plaintiff:**

C. Williams Phillips, Esq.
Joanne Sum-Ping, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York NY 10018
(212) 841-1000

**For Defendant:**

Harold F. McGuire, Jr., Esq.
140 Grand Street, Penthouse 2
White Plains, New York 10601
(914) 686-1500