William B. Wachtel
Elliot Silverman
WACHTEL MASYR & MISSRY LLP
One Dag Hammarskjold Plaza
885 Second Avenue, 47th Floor
New York, New York 10017
Tel: (212) 909-9500
Email: Wachtel@wmllp.com
Email: esilverman@wmllp.com

*Attorneys for Third Party*
*Defendant Gilad Sharon*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAGI GENGER and TPR INVESTMENT ASSOCIATES, INC., on behalf of AG PROPERTIES CO., <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> GILAD SHARON, LERNER MANOR TRUSTEESHIPS, LTD. and OMNIWAY LIMITED, <br><br> Third-Party Defendants. | CASE NO. 10-CIV-4506 (SAS)(GWG) <br><br> ECF CASE |

# THIRD PARTY DEFENDANT GILAD SHARON'S
# ANNOTATED PROPOSED FINDINGS OF FACT

Third Party Defendant Gilad Sharon respectfully submits the following annotations, indicating the portions of the trial transcript ("Tr.") and the exhibits received in evidence ("Ex.") which support Mr. Sharon's proposed findings of fact previously filed on November 21, 2012:

**PROPOSED FINDINGS OF FACT**

1. This case arises out of a commercial real estate venture in Canada (the "Canadian Venture") formed in or about 2001 by the Third Party Defendant in this action, Gilad Sharon ("Sharon"), and Arie Genger ("Arie"), the father of Sagi Genger ("Sagi"). Sagi is one of the Third Party Plaintiffs in this action. **Tr. 91:5-12 (Sagi); 362:8-21 (Arie).**

2. For more than two decades prior to the formation of the Canadian Venture, Arie had been close friends with Gilad's father, Ariel Sharon ("Ariel"), the former Prime Minister of Israel, and, during their relationship, Arie and Ariel and their respective families, including Sharon and Sagi, frequently socialized together. **Tr. 310:21-311:6 (Sharon); 361:7-20 (Arie).**

3. Sharon is a citizen and resident of Israel. **Tr. 309:14-15 (Sharon).**

4. The idea for the Canadian Venture arose from a presentation made to Sharon by a Canadian real estate broker concerning residential real estate investment prospects in Canada, which Sharon, in turn, presented to Arie. **Tr. 311:9-15 (Sharon); 362:8-21 (Arie).**

5. Based on these presentations, Arie and Sharon agreed to investigate and eventually acquire two residential apartment complexes in Montreal, known as "Durocher" and "Lincoln" (the "Canadian Properties"). **Tr. 91:5-7 (Sagi); 313:2-8 (Sharon).**

6. The Canadian Properties were eventually owned by the Canadian Venture under the following structure (the "Canadian Venture Structure"):

    a. Each apartment complex was owned by a separate trust; **Tr. 62:10-12 (Fischer); Ex. U.**

1

b. Both real estate holding trusts, in turn, were wholly owned by a Canadian entity, AG Properties Co. ("AG Properties"); **Tr. 111:15-17, 115:22-25 (Sagi); Ex. U.**

c. AG Properties was owned 50% by an entity controlled by Sharon and 50% by AG Holdings Co., a Canadian company ("AG Holdings"); and **Tr. 52:18-53:9 (Fischer); 115:22-25 (Sagi); Ex. U**.

d. AG Holdings, in turn, was wholly owned by AG Real Estate LP (the "Genger Family Partnership"), a U.S. limited partnership controlled at the time by Arie for the benefit of Arie's children, Sagi and Orly Genger ("Orly"). **Ex. U; Tr. 52:18-53:9 (Fischer).**

7. The Canadian Venture Structure was designed to obtain favorable Canadian income tax treatment from the operation and eventual sale of the Canadian Properties. **Tr. 62:2-12, 66:7-16 (Fischer).**

8. The Canadian Venture Structure was revised at least once to obtain optimal Canadian tax treatment and was not finalized until late 2002 or early 2003. **Tr. 63:7-11, 65:2-6 (Fischer); 279:21-25, 285:3-23 (Parnes); 364:20-365:7 (Arie); Ex. B.**

9. Sharon did not make his investment in the Canadian Venture until after the Canadian Venture Structure was finalized. **Tr. 364:20-365:7 (Arie).**

10. Arie invested US$25,000 in the Canadian Venture, for his 50% interest in the Canadian Venture, through the Genger Family Partnership. **Tr. 73:15-74:8 (Fischer); 364:5-9; 371:22-25 (Arie).**

11. The accounting records of AG Properties reflect that Sharon invested US$25,000 [CAD 36,790] in AG Properties through an Israeli entity, Lerner Manor Trusteeships Ltd. ("Lerner Manor"), which constituted Sharon's 50% interest, the same amount as Arie invested in the Canadian Venture. **Tr. 70:9-72:1, 73:19-74:8 (Fischer); Exs. 13, 19, H, I, J, K, L, V.**

12. Third Party Plaintiffs claim that Sharon also subscribed for 50% of AG Properties through a Cypriot corporation, Omniway Limited ("Omniway"), in the amount of US$1,250,000 (the "Omniway Subscription"), evidenced by a purported subscription promissory note (the "Omniway Note"). **Exhibits 8, 9.**

13. The accounting records of AG Properties do not reflect any subscription by Omniway at any price, nor do they reflect the existence of the Omniway Subscription or the Omniway Note. **Tr. 67:20-72:1 (Fischer); Exs. H, I, J, K, L.**

14. The accounting records of AG Properties do not reflect any matching $1.25 million investment by Arie, which would have been called for under the parties' 50/50 arrangement if, as Third Party Defendants claim, Sharon agreed to subscribe for $1.25 million. **Tr. 67:20-72:1 (Fischer); Exs. H, I, J, K, L.**

15. Third Party Plaintiffs do not possess the original Omniway Note, and have not satisfactorily explained its absence. **Tr. 204:19-20 (Sagi).**

16. The copy of the Omniway Note offered by Third Party Plaintiffs is signed with an illegible signature, with no indication of the name, title or authority of the signer. **Ex. 8, 9.**

17. No witness in this case has been able to identify the purported signer or attest to the execution of the Omniway Note. **Tr. 107:21-22 (Sagi); 238:9-12, 264:5-7 (Parnes).**

18. The copy of the Omniway Note offered by Third Party Plaintiffs refers on its face to certain attached Schedules, which are either incomplete or wholly missing. **Exs. A-3, 8, 9; Tr. 204:22-205:8 (Sagi); 260:1-262:8 (Parnes).**

19. Sonnenschein Nath & Rosenthal, Arie's personal attorney, served as U.S. counsel for the Canadian Venture **Tr. 53:24-54:2 (Fischer)**; **226:2-19 (Parnes).** Raines & Fischer, Arie's personal accountant, served as U.S. counsel **[accountants]** for the Canadian Venture. **Tr.**

3

**25:13-26:6 (Fisher).** Sharon was not represented by legal counsel in connection with the Canadian Venture. Sharon's personal accountant was Uri Harpaz, based in Israel. **Tr. 67:4-9 (Fischer); 279:7-10 (Parnes).**

20. Email exchanges and written memoranda between and among Raines & Fischer and Sonnenschein Nath & Rosenthal confirm that Sharon invested in the Canadian Venture through Lerner Manor and that the Omniway Note was never signed or delivered. **Exhibits 16, A1, A2, B, C, D, E, F.**

21. Sharon did not subscribe, direct or indirectly, or commit to subscribe, for an investment in the Canadian Venture for any amount greater than US$25,000, the same amount invested by Arie. **Tr. 73:11-74:8 (Fischer); 301:5-302:3 (Parnes); 311:16-312:24 (Sharon); 363:11-364:9, 371:22-25, 381:14-382:11 (Arie); Exs. 12, 13, 15, 19.**

22. The 50/50 partnership between Arie and Sharon also contemplated a sharing of responsibilities regarding the acquisition and management of the Canadian real estate properties: Ariel agreed to obtain third party financing to acquire the Canadian Properties and Sharon agreed to supervise the management of the Canadian Properties and arrange for their ultimate sale. **Tr. 311:7-20 (Sharon); 362:11-21 (Arie).**

23. In furtherance of this sharing of responsibilities, Arie arranged for financing of the acquisition of the Canadian Properties by a combination of mortgage financing from institutional financing sources and an unsecured loan in the amount of US$2,500,000 from a business acquaintance, Vladimir Gusinski (the "Gusinski Loan"). **Tr. 127:15-128:11 (Sagi); 376:20-379:7 (Arie).**

24. The Gusinski Loan was made in 2001 to AG Holdings, superior to Arie's equity investment in AG Holdings and its investment in the Canadian Venture; AG Holdings, in turn,

4

loaned the proceeds of the Gusinski Loan to AG Properties, as an unsecured loan, subordinate to the institutional mortgage financing for the Canadian Properties arranged by Arie, but superior to Sharon's investment in the Canadian Venture through AG Properties. **Tr. 127:15-128:11 (Sagi); 378:19-397:7 (Arie).**

25. Essentially, the Gusinski Loan was structured so that Arie's equity interest and Sharon's equity interest in the Canadian Venture remained the same, namely, both were in the same amount and were subordinated, first to institutional mortgage financing for the Canadian Properties, and then to the Gusinski Loan, before any payout of profits from the operation or sale of the Canadian Properties. **Tr. 127:15-128:11 (Sagi); 378:19-387:7 (Arie).**

26. As Sharon's part of the sharing of responsibilities, Sharon located and handled the acquisition of the Canadian Properties, and supervised their operation and management. Later, Sharon arranged for the ultimate sale of both properties at a total gross profit in excess of CAD$4,000,000. **Tr. 311:7-20, 312:25-313:22 (Sharon).**

27. The agreed arrangement between Arie and Sharon did not contemplate that any compensation would be paid to either of the partners during the pendency of the Canadian Venture; instead, the partners would share in profits after the Canadian Properties were sold and all creditors were satisfied. **Tr. 314:3-15 (Sharon).**

28. Prior to May 2003, Sagi had limited involvement in the Canadian Venture. In May of 2003, however, Arie arranged for Sagi to assist Sharon in the management of the Canadian Venture. **Tr. 368:13-369:14 (Arie); Exs. 21-22.**

29. The reason for Sagi's new involvement in the Canadian Venture was his forced resignation as an executive officer of a publicly-traded company in the United States and a subsequent bout of mental illness. **Tr. 89:20-90:15 (Sagi); 368:19-369:14 (Arie).**

5

30. Specifically, Sagi had been serving as an executive officer of Lumenis, Ltd., a public reporting company traded on NASDAQ. Sagi had obtained his positions at Lumenis primarily through the efforts of his father, Arie, who at the time had a controlling influence over the Board of Directors of Lumenis. **Tr. 89:10-21 (Sagi).**

31. In May 2003, Sagi resigned from Lumenis as a result of an SEC investigation into alleged improprieties in publicly-filed financial reports prepared by Sagi as the chief financial officer and chief operating officer of Lumenis. **Tr. 173:19-174:21 (Sagi).**

32. On or about April 26, 2006, the SEC commenced a civil proceeding against Sagi alleging that, from late 2001 through early 2003, Sagi had engaged in a fraudulent scheme to deceive Lumenis's investors. On the same day the SEC Complaint was filed, Sagi entered into a Consent Decree with the SEC barring him from further violations of federal securities laws. **Tr. 173:19-174:21; 183:2-5 (Sagi).**

33. Contemporaneously with Sagi's resignation from Lumenis in May 2003, Sagi suffered a nervous breakdown and was hospitalized. **Tr. 89:22-90:15, 172:4-5 (Sagi).**

34. Shortly thereafter, Sagi filed a disability insurance claim (the "Disability Claim") with The Guardian Life Insurance Company of America (the "Disability Carrier") under a disability insurance policy (the "Disability Policy") which Sagi, individually, had applied for in or about September 2002. The Disability Claim alleged that Sagi was unable to be gainfully employed due to his mental and emotional condition. **Withdrawn.**

35. The Disability Carrier not only denied Sagi's Disability Claim, but, in December 2004, also sued Sagi in New York State Supreme Court (the "Disability Claim Action") to rescind the Disability Policy, alleging that Sagi had fraudulently obtained the Disability Policy based on a written application submitted to the Disability Carrier that had falsely denied Sagi's

6

pre-existing history of major depression, hypo-manic behavior, hospitalization and treatment with antidepressant prescription medication. **Withdrawn.**

36. Sagi defaulted in the Disability Claim Action and judgment was entered against him in favor of the Disability Carrier in 2005. **Withdrawn.**

37. Sagi has no memory of events during the period of approximately six months after his hospitalization following his resignation from Lumenis in May 2003. **Tr. 172:4-173:2 (Sagi).**

38. The Court determines that Sagi Genger's testimony at the trial of this action was not credible. **Entire record.**

39. After Sagi began assisting in the management of the Canadian Venture, Sharon learned from an accountant to the Canadian Venture that Sagi had been making payments from the Canadian Venture to an entity affiliated with Sagi. **Tr. 314:21-315:6 (Sharon).**

40. Consistent with that information, accounting records reflect a payment from AG Properties, authorized by Sagi, to a Cayman Islands company which had also been the recipient of payments from Lumenis that were part of Sagi's severance package from Lumenis. **Tr. 206:11-15 (Sagi).**

41. Sharon confronted Arie and Sagi about the payments Sagi was diverting from the Canadian Venture and proposed that Arie and Sagi purchase his interest in the Canadian Venture so that Sharon could terminate his involvement. **Tr. 319:24-320:19 (Sharon).**

42. Arie persuaded Sharon to stay at least until the Canadian Properties were sold. **Tr. 320:3-19 (Sharon).**

43. Sharon agreed to remain with the proviso that any and all payments from the Canadian Venture to its partners (counting payments to Sagi as payments to a partner) be equal; Arie and Sagi agreed to that arrangement. **Tr. 315:2-6 (Sharon).**

44. Lincoln and Durocher were sold and closed in 2004 and 2005. **Tr. 191:19-23 (Sagi).**

45. Payments from the sales proceeds of Lincoln and Durocher were made to the partners in approximately equal amounts. **Ex. 23.**

46. A portion of the payments from the sales proceeds of Lincoln and Durocher were structured by Sagi as "Consulting Fees." **Tr. 100:7-9 (Sagi).**

47. Those "Consulting Fee" payments were documented by Consulting Agreements prepared by Sagi that were back-dated and contained false and misleading recitals, and which treated the payments as retroactive payments for past services. **Withdrawn.**

48. Ultimately, more than CAD1,000,000 was distributed to each of the partners of the Canadian Venture as "Consulting Fees". **Tr. 333:17-20 (Sharon); Ex. S.**

49. Although the Consulting Agreements covering the Genger share of payments recite that the payments thereunder were attributable to the services of Sagi, including periods prior to May 2003, none of those payments were made to Sagi or the Genger partner in the venture, AG Real Estate LP; instead, those payments were made to TPR Investment Associates, Inc. ("TPR"), a U.S. company controlled by Sagi, which had no ownership interest in the Canadian Venture. TPR is one of the Third Party Plaintiffs in this action. **Withdrawn.**

50. TPR had claimed on its U.S. income tax returns a net operating loss ("NOL") sufficiently large to shelter all of the Consulting Fees from U.S. income tax. **Withdrawn.**

8

51. The accounting records of TPR reflect only de minimis compensation paid to Sagi and others employed by TPR during the period covered by Consulting Fees. **Withdrawn.**

52. The accounting records of TPR further reflect that, as of December 31, 2004, Sagi's borrowings from TPR exceeded US$4 million, much of which included the tax sheltered Consulting Fee payments received by TPR from the Canadian Venture. **Withdrawn.**

53. After Lincoln and Durocher were sold, Sharon's interest in the Canadian Venture was bought out by AG Holdings in September 2005 for CAD $1,000,000. **Tr. 320:20-321:5 (Sharon); Ex. 14.**

54. Sagi negotiated the purchase by AG Holdings of Sharon's interest in the Canadian Venture. **Tr. 320:20-321:5 (Sharon).**

55. As part of the buy-out negotiations, Sagi acknowledged the Gusinski Loan and agreed that AG Holdings would repay that loan. **Withdrawn.**

56. Contemporaneously with the buy-out of Sharon, Sagi signed an instrument tendered to him by Arie agreeing to repay the Gusinski Loan before making distributions of the remaining assets of the Canadian Venture. **Withdrawn.**

57. Sagi dissipated all of the remaining assets of the Canadian Venture and rendered it judgment proof, without satisfying the Gusinski Loan. **Withdrawn.**

58. Gusinski sued AG Holdings to recover the Gusinski Loan and obtained a judgment against AG Holdings. **Withdrawn.**

59. Gusinski then brought this action to recover the Gusinski loan from Sagi, and Sagi settled with Gusinski. **Withdrawn.**

60. Sagi also sued Arie for indemnification and contribution for the claims against Sagi by Gusinski; Sagi's claims against Arie were dismissed by the New York County Supreme Court. *Genger v. Genger*, Index No. 100697/2008 (Decision and Order dated April 14, 2009).

Dated: New York, New York
December 11, 2012

**WACHTEL MASYR & MISSRY LLP**

By:    /s/ Elliot Silverman
William B. Wachtel
Elliot Silverman
1 Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
Tel: (212) 909-9500
Wachtel@wmllp.com
esilverman@wmllp.com
*Attorneys for Third Party Defendant Gilad Sharon*

# CERTIFICATE OF SERVICE VIA ECF SYSTEM

      I hereby certify that on the execution date stated below, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of New York, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic filing" to all counsel of record. The document that I electronically filed today is listed below.

      Third Party Defendant Gilad Sharon's Annotated Proposed Findings of Fact

Executed on December 11, 2012

                            WACHTEL MASYR & MISSRY LLP

                            Attorneys for Third-Party Defendant
                            Gilad Sharon

                              /s/ Elliot Silverman
                                Elliot Silverman

1125839.1