UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X
                                  :

SAGI GENGER and TPR
INVESTMENT ASSOCIATES, INC.,          :
on behalf of AG PROPERTIES CO.,
                                    :

          Third-Party Plaintiffs,          :

          - against -          :

GILAD SHARON,          :

          Third-Party Defendant.          :
------------------------------------------------------ X

**OPINION AND ORDER**

**10 Civ. 4506 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Sagi Genger ("Genger") and TPR Investment Associates, Inc. ("TPR," and together with Genger, "plaintiffs") bring this action to enforce a promissory note in the amount of $1.25 million against Gilad Sharon. The lawsuit arises out of a Canadian real estate venture (the "Canadian Venture") between Sharon and Genger's father, Arie Genger ("Arie").[1] Genger alleges that Sharon participated as a fifty percent equity owner in the Canadian Venture for consideration of $1.25 million in the form of a promissory note issued by Omniway, Limited

---

[1] Amended Answer and Third Amended Third-Party Complaint ("Compl.") ¶ 101; Third Party Defendant Gilad Sharon's Proposed Findings of Fact and Conclusions of Law ("Def. Facts") at ¶ 1.

1

("Omniway"), which was never paid.[2]  Sharon claims he invested only $25,000

through Lerner Manor Trusteeships, Ltd. ("Lerner Manor").

I held a bench trial from December 3, 2012 to December 5, 2012.  The

parties made post-trial submissions on December 11, 2012.  Pursuant to Rule 52(a)

of the Federal Rules of Civil Procedure, I make the following findings of fact and

conclusions of law.  In reaching these findings and conclusions, I heard the

evidence, observed the demeanor of the witnesses, and considered the arguments

and submissions of counsel.

## II.   FINDINGS OF FACT

### A.   The Parties

#### 1.   Sagi Genger

Sagi Genger is a joint United States and Israeli citizen residing at

1211 Park Avenue, New York, New York, 10128.[3]

#### 2.   TPR Investment Associates, Inc.

TPR is a Delaware corporation beneficially owned by the Genger

---

[2]      The suit first arose when Genger was named as a defendant in a
lawsuit brought by Vladimir Gusinski to recover a $2.5 million loan made to the
Canadian Venture in 2001.  Genger named Sharon as a third-party defendant in the
case.  The first-party suit with Gusinski settled and the third-party suit against
Sharon for enforcement of the $1.25 million note (the "Omniway Note")
proceeded.

[3]      *See Gusinksy v. Genger* Complaint ¶ 6.

family.  TPR brings this action on behalf of AG Properties, which assigned all

rights regarding claims against former AG Properties officers and affiliates to TPR

in 2007, as consideration for TPR assuming obligations on the part of AG

Holdings to repay the Gusinski loan.[4]

### 3.    Gilad Sharon

Third-party defendant Gilad Sharon is a citizen and resident of Israel.[5]

## B.    The Canadian Real Estate Venture

Amidst a maze of backdated, incomplete and contradictory

documents, and even more dubious testimony, a number of facts are undisputed.

In 2001, Sharon presented Arie with an idea for a joint venture involving

residential real estate investment prospects in Canada.[6]  Sharon and Arie agreed

that they would participate as fifty-fifty partners.[7]  In 2001, AG Properties was

---

[4]      *See* Plaintiffs' Exhibit ("PX") 32 (1/1/07 Agreement between AG
Holdings and TRP Investment Associates assigning TPR the right to institute legal
actions on behalf of AG Properties).

[5]      *See* Amended Joint Pretrial Order ("JPTO") ¶ 12.

[6]      For more than two decades prior to the formation of the Canadian
Venture, Arie was close friends with Sharon's father, Ariel Sharon, the former
Prime Minister of Israel.  The families socialized together frequently.  *See* 12/4
Trial Transcript ("Trial Tr.") at 361-62 (A. Genger).

[7]      *See id.* at 229 (Parnes) ("Each was to be a fifty percent equity
shareholder or interest holder).  *Accord id.* at 311 (Sharon); *id.* at 363 (A. Genger)
("From day one, we will be 50/50 partners.").

incorporated in Nova Scotia, with Arie as its sole director.[8]  On December 31, 2001, AG Holdings, another corporation under the sole directorship of Arie, acquired one-hundred percent of the shares of stock in AG Properties.[9]  AG Holdings was wholly owned by AG Real Estate LP (the "Genger Family Partnership"), which was controlled at the time by Arie for the benefit of his children Sagi and Orly Genger.[10]  During 2001 and 2002, the venture acquired two residential apartment complexes in Montreal known as the "Durocher" property and the "Lincoln" property (together the "Canadian Properties").[11]

The two buildings were acquired for approximately twenty million Canadian dollars.[12]  Approximately twelve million dollars of the financing came

---

[8]      *See* JPTO ¶¶ 1, 2.

[9]      *See id.* ¶ 3.  *See also* 12/3 Trial Tr. at 69 (Fischer) (discussing general ledger reflecting the transaction).

[10]     *See* 12/3 Trial Tr. at 52-53 (Fischer).  *Accord* PX 26 (Chart dated 9/20/01 reflecting structure of CanadianVenture with Omniway Limited); Defendants' Exhibit ("DX") U (Chart dated 9/20/01 reflecting structure of CanadianVenture with Lerner Manor Trusteeship, Ltd.).

[11]     See JPTO ¶ 4. AG Properties purchased each property through separate wholly owned subsidiaries, AG Land No. 1 Co. and AG Land No. 2 Co., which directly owned the two Canadian properties.  *See* PX 17 (promissory note from AG Land No. 1 to AG Properties in the amount of $3,753,280, signed by Arie Genger).

[12]     *See* 12/3 Trial Tr. at 127 (S. Genger).

from first and second lien mortgage debt.[13]  The balance, approximately eight

million dollars, which was not secured by any real property, came from various

loans directly or indirectly from Genger entities including a loan of $2.5 million

from AG Holdings, also a Genger entity, which borrowed the money from

Gusinski.[14]  Arie testified that he did not personally guarantee any of the loans and

that the Gusinski loan was not secured against the real property, but he was not

certain about the other loans.[15]

      From the outset the goal in structuring the Canadian Venture was to

---

[13]    *See id.*

[14]    *See id.*; 12/4 Trial Tr. at 377 (A. Genger).  *See also* PX 10 (Written Consent of Directors of AG Properties to enter into a shareholders agreement with Omniway, signed by Arie Genger).  Arie testified that he "had a concern that the two and a half million dollars I was able to secure from Mr. Gusinski, that he might require a security, at which time. . . I will have to have a guarantee of a million and a quarter and then Gilad would have to do the same.  As it turned out, he did not ask me for a personal guarantee, and I think he took collateral of one of the companies."  12/4 Trial Tr. at 378-379 (A. Genger).  *See also* PX 4 (Pledge Agreement between V. Gusinksi and AG Real Estate Partners) (in which AG Real Estate was the Pledgor and AG Land Co. 1 was the Maker, and which pledged shares of AG Land Co. as security for the loan).  However, the Omniway vehicle was in consideration long after the terms of the Gusinski loan were finalized.  *See* 12/4 Trial Tr. at 382 (A. Genger).

[15]    *See id.* at 364.  Arie testified that at the beginning he was concerned that Gusinski would require security for the $2.5 million loan, in which case both he and Sharon would have had to guarantee $1.25 million, but "as it turned out he did not ask . . . for a personal guarantee" but rather took collateral of one of the companies.  *Id.* at 378.

enable a flow-through effect for the benefit of the shareholders without there being any duplicate taxation.[16]  In 2002, there were discussions about restructuring the Canadian Venture because "the tax structure that was in place . . . was flawed in that it did not consider a particular aspect of Canadian taxation."[17]  The properties were placed in trust in 2002.[18]

### C.    Sharon's Investment in AG Properties

The source of Sharon's investment in the Canadian Venture is the crux of this litigation. Central to the agreement between Arie and Sharon was that each would have a fifty percent interest in AG Properties.[19]  Beyond that, the terms of Sharon's investment in AG Properties are anything but clear, not in small part because of his evasive testimony and unwillingness to cooperate in locating relevant information.[20]  According to Arie and Sharon, the deal was that Arie

---

[16]    *See* 12/3 Trial Tr. at 66 (Fischer).

[17]    *Id.* at 62.

[18]    *See* JPTO ¶ 5.  *See also* DX F (10/14/02 Email between D. Parnes and U. Harpaz) ("AG 1 and AG 2 will each transfer the property they own to a US trust.").

[19]    *See* 12/4 Trial Tr. at 229 (Parnes) ("Each was to be a fifty percent equity shareholder or interest holder).  *Accord id.* at 311 (Sharon); *id.* at 363 (A. Genger) ("From day one, we will be 50/50 partners.").

[20]    Initially, Sharon appeared on behalf of Omniway, and then disavowed any knowledge of the company, which resulted in sanctions against Sharon and his attorneys.  *See Genger v. Sharon*, No. 10 Civ. 4506, 2012 WL 3854883 (S.D.N.Y.

6

would provide the financing and Sharon would provide the sweat.[21]  Genger argues that Sharon purchased his fifty percent interest in AG Properties through Omniway, a Cypriot company, with a $1.25 million promissory note (the "Omniway Note") dated February 6, 2002 and secured by shares in AG Properties.[22]  Sharon and Arie contend that Sharon invested only $25,000 – the same *capital* contribution that Arie made – through Lerner Manor, an Israeli trust that was first registered on September 9, 2002,[23] with documents backdated "as of" February 6, 2002.[24]

### 1.    The Omniway Note

Sept. 5, 2012). Throughout the litigation and at trial Sharon denied any knowledge that Omniway was ever the contemplated vehicle of his investment, which is difficult to reconcile with the documentary evidence in this case.  *See* 12/4 Trial Tr. at 342 (Sharon) (stating that he did not make any inquiries with the directors and officers of Omniway as to whether they had ever seen the original of the purported Omniway note).  In addition, he made no effort to obtain information regarding the role of Omniway in securing his interest in the Canadian Venture.  *See* 12/4 Trial Tr. at 323-324 (Sharon) (denying any knowledge of Omniway).

[21]    *See id.* at 311 ("[W]e agreed from the beginning that we will be 50/50 partners.  I will give the sweat. He will take care of the finance.").

[22]    *See* Third-Party Plaintiffs' Trial Memorandum of Law ("Pl. Mem.") ¶ 3.

[23]    See PX 6 (Translated Hebrew document reflecting that Lerner Manor was incorporated on 9/9/02).

[24]    *See* 12/4 Trial Tr. at 363 (A. Genger) (testifying that he and Sharon had an agreement that Sharon would invest the same amount of cash as Arie – $25,000).

Omniway Limited was incorporated in Cyprus on July 6, 2001,[25]

apparently for the purpose of providing a vehicle through which Sharon could

invest in the Canadian Venture.[26]  Although no original of the Omniway Note has

been produced, two copies have been found.  The Note, dated February 6, 2002,

provides for payment to AG Properties of the principal sum of $1.25 million in

three annual installments with the outstanding principal sum due on July 24,

2011.[27]  No payments have been made of the principal or interest due under the

Omniway Note.  The Note states

> [a]t the same time as it executes this Note, the Maker
> [(Omniway)] deposits with or transfers to the Payee [(AG
> Properties)] or its nominee certificates representing the Shares and
> also delivers to the Payee a power of attorney executed in the form
> of the attached Schedule A, a stock transfer executed in blank in

---

[25]    *See* PX 5 (Certificate of Incorporation for Omniway Limited).

[26]    *See* PX 7 (8/29/01 Email from Lefkios Joannides of Omniway to Uri Harpaz).  Uri Harpaz was Sharon's accountant and he forwarded the email from Joannides to someone who reads Hebrew with a note that said "For your information - Uri."  There is also a handwritten note in English on the document that says "Gilaed's Company."  *Id.  See also* 12/3 Trial Tr. at 142 (S. Genger) (translating Hebrew, and noting that Harpaz is Sharon's accountant).

[27]    *See* PX 8 (2/6/02 Signed Promissory Note from Omniway Limited (without schedules) from Raines & Fischer Files).  *See also* PX 9 (2/6/02 Signed Promissory Note from Omniway Limited from Genger files (with blank schedules A and B)).  Arie Genger testified that he "would not have asked him for [$1.25 million] because [he] never put such money in."  *See* 12/4 Trial Tr. at 372 (A. Genger).  But the evidence and testimony clearly show that this was, at one point, the contemplated structure of Sharon's investment.

8

the form of the attached <u>Schedule B</u> . . . and a copy of a resolution of the board of directors of [Omniway] substantially in the form of the attached <u>Schedule C</u>.[28]

The files of Raines & Fischer, the accounting firm for the Canadian Venture, contained a signed copy of the Omniway Note.[29]  David Parnes, an attorney who prepared the documents for the Canadian Venture testified that he believed that the signature said "Joka."[30]  Joka Secretarial Limited was the secretary of Omniway as well as a shareholder.[31]  The "name" and "title" lines on the note are blank.[32]  There is no resolution authorizing Joka to sign the note in evidence,[33] and Parnes acknowledged that it was odd that it was just signed, "Joka," rather than "Joka Secretarial Limited."[34]  No copy of the Note containing

---

[28]     *See id.*

[29]     *See* 12/3 Trial Tr. at 29.  *See also* PX 8 (2/6/02 Signed Promissory Note from Omniway Limited (without schedules) from Raines & Fischer Files).

[30]     12/4 Trial Tr. at 264 (Parnes).

[31]     *See id.  See also* PX 7 (8/29/01 Email from Lefkios Joannides of Omniway to Uri Harpaz.)

[32]     *See* PX 8 (2/6/02 Signed Promissory Note from Omniway Limited (without schedules) from Raines & Fischer Files).

[33]     *See* 12/4 Trial Tr. at 205 (S. Genger).

[34]     *See id.* at 264 (Parnes).

executed schedules has been produced.[35]   Raines & Fischer's files also contain: (1)

a written consent on behalf of AG Holdings signed by Arie resolving to enter into a

voting trust agreement and shareholders' agreement with Omniway, which would

regulate the rights and obligations of AG Holdings and Omniway as shareholders

of AG Properties;[36] and (2) an unexecuted AG Properties Shareholder's Agreement

between AG Holdings and Omniway, each for one hundred shares.[37]

Copies of an executed, albeit incomplete, Omniway Note were also

found in the files of AG Properties, and there are charts as early as September 20,

2001 that show a structure in which Sharon invested $1.25 million in AG

Properties through Omniway.[38]   However, the testimony and evidence presented at

---

[35]     *See id.* at 205 (S. Genger) (stating that he never saw executed versions
of the schedules).

[36]     *See* PX 10 (Written Consent of Directors of AG Properties to enter
into a shareholders agreement with Omniway, signed by Arie Genger).

[37]     *See* PX 11 (AG Properties Shareholders Agreement Regarding
Disposition of Voting Trust Certificates between AG Holdings and Omniway,
dated 2/6/02). This conflicts with Parnes' testimony that "originally Omniway was
not supposed to have a stock certificate. Omniway requested that AG Holdings
hold its fifty percent interest through AG Holdings. So the deal originally was that
AG Holding would hold fifty percent on its own behalf and fifty percent for
Omniway. So I am not surprised there was no share certificate." 12/4 Trial Tr. at
272 (Parnes).

[38]     *See* PX 26 (Chart dated 9/20/01 reflecting structure of
CanadianVenture with Omniway Limited). Because no structure had been
implemented as of September 2001, the obvious conclusion is that the chart was

trial suggest that the Ominway Note was not tendered, at least not as of February 6, 2002.  On February 6, 2002 Arie executed the promissory note, and the Shareholders' Agreement on behalf of AG Holdings.[39]  In a February 2003 memorandum to Ed Klimerman, Arie's attorney, David Parnes, the associate responsible for drafting the Canadian Venture documents, explained that Sharon kept returning the Omniway documents unsigned through May 2002, because the tax laws in Israel had recently changed and Sharon was debating whether to enter into the transaction in his individual capacity.[40]  And according to a memorandum from Parnes and Klimerman, as of August 2002, "the sole shareholder of AG Properties Co. remain[ed] AG Holdings Company."[41]

---

merely a  possibility, not a reflection of the actual structure of the venture.  There is also a substantially identical chart, also dated 9/20/01 but with Lerner Manor substituted as the investment vehicle for Sharon.  *See* DX U (Chart dated 9/20/01 reflecting structure of CanadianVenture with Lerner Manor Trusteeship, Ltd.).  As Lerner Manor did not even exist under February of 2002, there is no question that this was *at best* a possibility, and cannot have been the structure as of September 2001.  It is also obviously backdated.

[39]     DX A2 (2/24/03 Note from D. Parnes to E. Klimerman laying out timeline).

[40]     *Id.*

[41]     DX A1 (8/6/02 Memorandum from D. Parnes and E. Klimerman to A. Genger, G. Sharon, and S. Genger, cc'ing W. Fischer re: Canadian Properties) ("Awaiting to receive from Gilad executed copies of the Shareholders Agreement and ancillary documents, by Omniway Limited (currently, the sole shareholder of AG Properties Co. Remains AG Holdings Company).") (attaching 2/6/02

In October 2002, in the context of rearranging the corporate structure of the Canadian Venture, Parnes sent an email to Uri Harpaz, Sharon's accountant, describing the Omniway vehicle including the $1.25 million investment sum as "50% of the liabilities of the Properties," but noting that "[a]s of now, Omniway did not execute any of the documents it was supposed to be party to, including the Promissory Note . . . and the Shareholders Agreement."[42]  Parnes noted that Sharon told him that "it might be advisable to do away with Omniway."[43]  Utterly implausibly, Sharon denies that he ever knew anything about Omniway or the possibility that his interest in AG Properties would be secured by a $1.25 million promissory note.[44]

Notes from a series of meetings among the parties to the Canadian Venture and their lawyers show that as of March 2003 the terms of Sharon's

Subscription Agreement signed by AG Properties, unsigned by Omniway, and the unsigned Omniway Note).

[42]   PX 25 (Oct.-Dec., 2002 Email chain between D. Parnes and U. Harpaz).  *See also* DX A2 (Parnes stated that he met with Sharon in February 2002 to go over the Shareholders Agreement and ancillary documents but Gilad had certain reservations with respect to control of AG Properties).

[43]   PX 25 (Oct.-Dec. 2002 Email chain between D. Parnes and U. Harpaz).  *See also* 12/3 Trial Tr. at 67 (Fischer) (testifying to a conversation with Harpaz discussing that as a result of changes in the Canadian structure, there were reasons for Sharon to reconsider using a Cyprus entity to invest).

[44]   *See* 12/4 Trial Tr. at 323-324 (Sharon).

investment were still in flux, and his fifty percent interest had not been formally

secured by either the Omniway Note or through Lerner Manor.[45]  Parnes' notes

from a March 12, 2003 meeting with, among others, Sharon, reflect that that

"Gilad want[ed] to have his 50% interest in 'Properties' held by a trustee/nominee

on his behalf" meaning "a 'simple agreement' between Gilad and the trustee

should exist [whereby the] trustee will be obliged to pay the $25,000 when called

upon."[46]  Parnes was directed to arrange for the trust documentation.[47]  At a March

14, 2003 meeting, Klimerman expressed that "Gilad's trustee/nominee must *now*

execute the promissory note" because they needed another shareholder on the

books.[48]  Arie needed a name because he had "declared under oath that he is 50%

_____

[45]     *See* PX 16 (Notes of D. Parnes re: March 2003 meetings). In his Complaint, Genger alleges that in 2003 Arie and Sharon agreed to *substitute* Lerner Manor for Omniway as a fifty percent stockholder of AG Properties for $25,000 consideration. *See* Compl. ¶ 104.  However, the evidence, in particular, Genger's concern that there was no formalization of Sharon's fifty percent ownership as of 2003, belies this contention.  *See* DX B (Email chain among W. Fischer, U. Harpaz, and D. Parnes from 10/23/02 - 2/6/03).  When Fischer asked Harpaz whether Sharon or Omniway would be the beneficial owner of the trust, Harpaz resonded that Sharon would be the beneficial owner, through a nominee. Fischer then requested the name of the trust throught which Sharon would hold the interest.  *See id.*

[46]     PX 16 (Notes of D. Parnes re: March 2003 meetings).

[47]     *Id.*

[48]     *Id.*

owner together with Gilad" and they had to have it "papered."[49]  Parnes testified

that during a matrimonial dispute between Arie and his wife Dalia Genger, Arie

wanted to prove that he was only a fifty percent shareholder of AG Properties and

wanted to "show Omniway as the other 50 percent shareholder [which] Gilad

opposed, did not want Omniway circulating around."[50]  "[T]hat was the

opportunity to change the holding, [which] created organizational costs" which is

what the twenty-five thousand dollar capital contribution related to.[51]

        The Omniway Note is not reflected in the general ledger or tax returns

for AG Properties.  William Fischer, the accountant for the Canadian Ventures who

prepared the financial statments and tax returns, testified that had the Note been

tendered to AG Properties, it would have shown up on the balance sheet and the

tax return.[52]  Fischer also testified that "[i]n the beginning it was supposed to be

---

[49]    *Id.*

[50]    12/4 Trial Tr. at 307 (Parnes).

[51]    *Id.*  This does not, however, jibe with his contemporaneous statements in emails that the Omniway Note was never tendered.  Moreover, there is no evidence that they merely "change[d] the holding" – rather it appears that the $1.25 million was abandoned entirely.

[52]    *See* 12/3 Trial Tr. at 71 (Fischer).  Genger, however, testified that "a stock subscription receivable may not be reflected as an asset on the balance sheet."  *Id.* at 130-131 (S. Genger). "[T]he proper reflection would simply be a footnote."  *Id.*

Omniway.  Whether or not Omniway ever . . . secured its interest, obtained its interest, I don't recall that specifically."[53]  Finally, Fischer noted that "by definition, a secured promissory note means you're securing something.  So my experience is generally whatever – serving as a security would be attached."[54]

### 2.    Lerner Manor

Lerner Manor was first registered on September 9, 2002, well after the agreements were purportedly executed.[55]  Raines & Fischer's files contain the following documentation: (1) an executed AG Properties Shareholders Agreement made "as of" February 6, 2002 between AG Holdings and Lerner Manor, signed illegibly by Lerner but with his name and position as manager written, and stamped with Lerner Manor's registration number, signed by Arie, and attaching stock certificates for both companies;[56] and (2) an executed Subscription Agreement for one hundred shares of AG Properties for the consideration of twenty-five thousands dollars, signed by Lerner, in the same illegible scrawl, and stamped with

---

[53]     *Id.* at 68 (Fischer).

[54]     *Id.* at 61.

[55]     *See* PX 6.

[56]     *See* PX 12 (AG Properties Shareholder Agreement Regarding Disposition of Shares between AG Holdings Company and Lerner Manor Trusteeships, Ltd., dated "as of" 2/6/02).

Lerner Manor's registration number, and signed by Arie as president of AG Properties.[57]

The evidence shows that Lerner Manor *ultimately* held fifty percent of the shares in AG Properties for the benefit of Gilad Sharon. Fischer testified that "based upon the books and records [he] maintained at Raines & Fischer, from inception to the day [he was] discharged, that the only investment that Mr. Gilad Sharon made in AG Properties, directly or indirectly, was the $25,000 capital contribution."[58] Fischer testified that the vehicle by which Sharon invested "had to be a trusteeship to have that flow through" for tax purposes.[59] As already discussed, as of March 2003, the vehicle through which Sharon would invest was not yet finalized. Then, in June 2003, in connection with a refinancing of the Canadian Venture, Fischer sent Parnes an email requesting information regarding Sharon's investment in AG Properties.[60] Parnes promptly responded, "if I recall correctly, Gilad's fifty percent interest was properly documented. I believe he did

---

[57]    *See* PX 13 (2/6/02 Executed (backdated) Subscription Agreement for Shares of AG Properties).

[58]    12/3 Trial Tr. at 74 (Fischer) (stating "[t]hat I certainly remember").

[59]    *Id.* at 78.

[60]    *Id.* at 75. *See also* DX E (9/20/03 Emails between D. Parnes and W. Fischer). Fischer testified that he needed to represent ownership for the purposes of the refinancing. *See id.* at 76.

16

not sign a $1.25 million note, but *instead* transferred funds to purchase the equity outright.  He and [AG] Holdings were granted the same terms."[61]  Those "same terms" referred to the twenty-five thousand dollars capital contribution that Arie and Sharon each made.[62]

   In January 2004, Fischer emailed Harpaz with information regarding Sharon's investment.  It states that a capital contribution of twenty-five thousand dollars was made in March of 2003 and that shares of the 2001 and 2002 taxable losses were retroactively attributed to Sharon as a result of this contribution.[63]

   Parnes testified at trial, almost ten years later, that Sharon "transferred" his ownership from Omniway to Lerner Manor.[64]  His explanation for this inconsistent testimony is that at the time he had not seen the signed Omniway

---

[61]  DX E (9/20/03 Emails between D. Parnes and W. Fischer).

[62]  12/3 Trial Tr. at 75 (Fischer).

[63]  *See* DX C (Email chain between W. Fischer and U. Harpaz). *See also* 12/3 Trial Tr. at 83 (Fischer) (testifying that as a result of his communications with Parnes, Fischer attributed to Lerner Manor its share of the losses for the calendar year of 2001-2002).  The financial statements that Fischer prepared were unaudited, as opposed to audited, which means that the firm was not required to render an opinion, after undertaking a series of tests and inquiries, about whether the statements accurately depict the financial condition for a given period of time. *See id.* at 85-86.  In contrast, an unaudited statement may simply be a compilation of the records provided by management.  *See id.* at 86.

[64]  *See* 12/4 Trial Tr. at 230 (Parnes). *See also id.* ("And subsequently he changed ownership, his interest, to be owned from Omniway to Lerner Manor.").

Note, but he has since seen it.[65]  Parnes explained that the only written instrument

reflecting the transfer from Omniway to Lerner Manor is the fact that "Lerner

Manor is ultimately the equity holder for Mr. Sharon."[66]

### D.  Sagi Genger's Involvement and Buyout of Sharon

Sagi Genger testified that he was not involved in the business

operations of AG Properties until late 2003 or early 2004.[67]  He "didn't participate

in how the deal was cut between the Sharon family and the Genger family."[68]  In

2004, Sagi Genger bought his father out of AG Properties, and became the one

"running the show."[69]  Genger began contemplating buying out Sharon's half of

---

[65]     *See id.* at 233.  Parnes testified that the fact that he never saw the
signed note was unsurprising because he always prepared documents and then sent
them to Linda Rosette, Arie's assistant.  *See id.* at 234.  However, the emails show
that he dealt directly with Sharon regarding the Omniway documents, and that the
documents were returned to him albeit unsigned. Today Parnes works for Sagi
Genger, is the sole officer of AG Properties, his wife is an officer of TPR, and
Genger helped pay for his business school.  *See id.* at 267, 302, 307.  It can hardly
be said that Parnes is a neutral witness.

[66]     *Id.* at 257.

[67]     *See* 12/3 Trial Tr. at 96 (S. Genger).  Early on in the venture, Sagi
Genger was involved in a limited capacity in the structuring of the Canadian
Venture – specifically he helped obtain a tranche of mezzanine financing for the
purchases, transferring the properties into trusts, and refinancing the mortgages.
*See id.* at 91.

[68]     *Id.* at 108-109.

[69]     *See id.* at 153.  Arie did not officially resign as director of AG
Holdings and AG Properties until August 2005.  *See* PX 21 (Resignation Letter of

the venture as early as 2004, but the buy-out did not occur until late 2005.[70]
During conversations with Sharon, Genger learned that "[a]t some point [Sharon]
determined that it was in his best interest not to hold the shares through a Cyprus
company, but rather to hold them directly in Israel."[71]  Genger testified in his
deposition that the one million Canadian dollars that Sharon received in the buyout
was "a negotiated fair market deal," and later clarified that he thought it was
"satisfactory . . . given what I understood to be my legal rights at the time."[72]  A
Stock Purchase Agreement dated September 21, 2005 shows that Lerner Manor
sold one hundred shares and fifty units of each of the Trusts, "such shares and units
ownership representing the remaining fifty (50%) ownership of each entity" and
that AG Holdings paid twenty-five thousand Canadian dollars for the purchase of
the shares and 975,000 Canadian dollars for the purchase of the units of the trust.[73]

---

Arie Genger from all of the Canadian Venture entities); PX 22 (Resolutions
appointing Sagi Genger director of the Canadian Venture entities).

[70]    *See* 12/3 Trial Tr. at 119 (S. Genger).  *See also* PX 23 (8/16/04
Memorandum from S. Genger to G. Sharon re: "Break Up of AG Properties")
(suggesting a fair market value buy out of $1,300,417 Canadian dolars).

[71]    12/3 Trial Tr. at 99 (S. Genger). Genger testified that he believed the
reluctance to use a Cypriot entity stemmed from the criminal investigations
pending against Sharon in Israel at the time.  *See id.*

[72]    12/4 Trial Tr. at 209 (S. Genger).

[73]    PX 14 (9/21/05 Stock Purchase Agreement between AG Holdings and
Lerner Manor.  Parnes at one point testified that "the holding was not necessarily

Genger testified that he and his father shared office space, and that in late 2006, after an acrimonious parting of ways between father and son, he unilaterally took all materials related to his "various interests" including the Canadian Venture.[74]  Genger testified that he first really looked at the documents in 2007 when he learned that Canadian police had been investigating the Canadian Venture.[75]  He explained that he saw "essentially . . . two sets of documents that apparently reflect the same transaction, one of which are on their face an impossibility because of their dates."[76]

Genger testified that "[t]he million and a quarter dollar commitments of the Omniway note, in my mind, represented a reasonable counterbalance to the

---

through shares.  There was also talk of holding the whole equity interest through business units."  *Id.* at 258.  However, he ultimately agreed that the purpose of the Omniway note was "as consideration for shares in AG Properties" meaning that the Omniway note was to be secured by a stock certificate.  *Id.* at 258-259.

[74]    *See* 12/3 Trial Tr. at 105 (S. Genger).  In late 2006, Genger also fired Fischer as his accountant because he "didn't feel that his behavior reflected that he was acting in [Sagi Genger's] best interest."  *Id.* at 156.

[75]    *See id.* at 105-106.  Genger stated that he "faced the reality that on the one hand the Israeli police were in criminal investigation, that [he] had paid out a significant amount of money to Mr. Sharon, that there was a note outstanding to offset it, and that [he] didn't do anything about it."  *Id.* at 106.

[76]    *Id.*

20

eight million dollars unsecured loan."[77]  "It would . . . mean that we were sharing the first twenty percent of downside on the property."[78]  Genger testified in sum that "the documents . . . exist [and] make sense as a basic commercial matter . . . [a]nd that's basically where I stand."[79]

## II.   APPLICABLE LAW[80]

### A.   Prima Facie Case of Default

To establish a prima facie case of default on a promissory note under New York law,[81] a plaintiff must provide proof of the valid note and of defendant's

---

[77]   *Id.*

[78]   *Id.* at 128-129.

[79]   *Id.* at 130.

[80]   The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 and venue is proper.  *See* JPTO ¶ 2.  I held at the final pretrial conference that Sharon had waived the argument that the court lacked personal jurisdiction over him by failing to raise during this two year litigation and, moreover, that the New York Long Arm Statute very likely reached him anyway. *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) (holding that "delay in challenging personal jurisdiction by motion to dismiss may result in [forfeiture]" of a defense challenging application of the New York Long Arm Statute).

[81]   Although the Omniway Note states that it shall be governed by Nova Scotia Law, *see* PX 9 ((2/6/02 Signed Promissory Note from Omniway Limited from Genger files (with blank schedules A and B)) at 4, both parties have stipulated that New York law, which they believe is substantially similar to Nova Scotia law, should govern this Court's decision.  *See* 12/6 Trial Tr. at 436-437 (Closing Argument of J. Dellaportas) (noting that "neither side is arguing for the application of Nova Scotia law").

failure, despite proper demand, to make payment.[82]

### 1.   Rights of Holders and Holders in Due Course

A "holder" is defined by the New York Uniform Commercial Code

("N.Y.U.C.C.") as a "person who is in possession . . . of an instrument . . . drawn,

issued or endorsed to him."[83]  A holder in due course is "a holder who takes the

instrument (a) for value;  (b) in good faith; and (c) without notice that it is overdue

or has been dishonored or of any defense against or claim to it on the part of any

person."[84]

A holder in due course "takes the instrument free from all defenses of

---

[82]    *See Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd.*, 117 F. Supp. 2d 394, 399 (S.D.N.Y. 2000) (citing *Gateway State Bank v. Shangri-La Private Club for Women, Inc.*, 493 N.Y.S.2d 226 (2d Dept. 1985), *aff'd*, 499 N.Y.S.2d 679 (1986).  "Under Article 3 of the New York Uniform Commercial Code ("N.Y.U.C.C.") a promissory note constitutes a valid negotiable instrument if it contains a an unconditional promise to pay a sum certain, is signed by the maker, and payable to order or bearer on demand or at a definite time."  *Id.* (citing N.Y.U.C.C. § 3-104(1)).

[83]    N.Y.U.C.C. § 1-201.

[84]    *Id.* § 3-302.  A holder in due course must first be a holder. *Consolidated Capital Corp. v. DeSalvo*, 550 N.Y.S.2d 803, 805 (Civ. Ct. N.Y. Co. 1990).  A purchaser has notice of a claim or defense if "(a) the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership . . . or (b) the purchaser has notice that the obligation of any party is voidable in whole or in part, or that all parties have been discharged."  N.Y.U.C.C. § 3-304.

22

any party to the instrument with whom the holder has not dealt."[85]  In contrast, one

who is not a holder in due course takes an instrument subject to "all defenses of any

party which would be available in an action on a simple contract; and . . . the

defenses of want or failure of consideration, non-performance of any condition

precedent, non-delivery, or delivery for a special purpose."[86]

###   2.   Burden of Establishing Signatures, Defenses and Due Course

When the effectiveness of a signature is put in issue "the burden of

establishing it is on the party claiming under the signature, but [with exceptions not

applicable here,] the signature is presumed to be genuine or authorized."[87]  However,

if the defendant puts forth evidence sufficient to "support his denial by permitting a

finding in his favor . . . the burden of establishing the signature by a preponderance

of the total evidence is on the plaintiff."[88]  "When signatures are admitted or

established, production of the instrument entitles a holder to recover on it unless the

---

[85]   N.Y.U.C.C. § 3-305.  "All defenses" includes nondelivery, conditional delivery or delivery for a special purpose. . . . Accordingly the "conclusive presumption" of the third sentence of the original Section 16 is abrogated in favor of a rule of law cutting off the defense."  *See id.* (Official Comment).

[86]   *Id.* § 3-306 (citing *id.* § 3-408).

[87]   *Id.* § 3-307(1).

[88]   *Id.* (Official Comment).

defendant establishes a defense."[89]  If a defense is established the "person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course."[90]

### B.    Enforcement of a Lost or Stolen Instrument

Under the N.Y.U.C.C., "[t]he owner of an instrument which is lost, whether by destruction, theft or otherwise, may . . . recover from any party liable thereon upon due proof of his ownership, the facts which prevent his production of the instrument and its terms."[91]  However, that person "does not have the holder's prima facie right to recover under the section on the burden of establishing signatures."[92]  Rather "[h]e must prove his case" by "establish[ing] the terms of the instrument and his ownership, and must account for its absence."[93]

### III.    CONCLUSIONS OF LAW

It is disheartening to hold a bench trial for the purpose of weighing credibility in a hotly contested factual dispute, only to be faced with layer upon layer of deceit and dysfunction neccesarily leading to the conclusion that, at best, only one

---

[89]     *Id.* § 3-307(2).

[90]     *Id.* § 3-307(3).

[91]     *Id.* § 3-804.

[92]     *Id.* (Official Comment).

[93]     *Id.*

of five witnesses – the accountant – could possibly be deemed credible.
Notwithstanding the shenanigans surrounding the Canadian Venture, this case comes
down to a single, straightforward issue: Did Gilad Sharon take his fifty percent
interest in the Canadian venture through Lerner Manor for twenty-five thousand
dollars cash or did he buy it through Omniway with a promissory note for $1.25
million?

### A.    TPR's Status with Respect to Enforcement of the Omniway Note

TPR's rights to enforce the Omniway Note dictate plaintiffs' burden at
trial and how, if at all, Sharon's defenses are to be evaluated.  Plaintiffs' assumption
that TPR is a holder at all, let alone a holder in due course of the Omniway Note, has
several deficiencies.  *First*, plaintiffs failed to produce an original of the promissory
note and only incomplete copies of the Note have been produced.  *Second,* the
Omniway Note was issued to AG Properties, and is not endorsed to TPR.  *Third*
plaintiffs had ample evidence upon discovery of the Omniway Note of the defenses
to its enforceability.

The fact that no original of the Omniway Note has been located, and the
fact that defendants dispute that a complete original *ever* existed, places plaintiffs
within N.Y.U.C.C. § 3-804, meaning they must prove "ownership of the notes, the

circumstances of the loss and their terms."[94]  Even if plaintiffs can prove these

elements, to the extent that TPR was validly assigned the Omniway Note from AG

Properties, a matter which is itself in doubt,[95] TPR took it knowing full well that any

enforcement would be subject to the defense that Lerner Manor, not Omniway was

the source of Sharon's investment in AG Properties.[96]  Thus, even if plaintiffs had

---

[94]    *Marrazzo v. Piccolo,* 558 N.Y.S.2d 103, 103 (2d Dept. 1990) (holding that "[n]otwithstanding her failure to produce the original promissory notes, the defendant could still recover pursuant to UCC 3–804").  *Accord Kraft v. Sommer*, 387 N.Y.S.2d 318, 319 (4th Dept. 1976) (suit was proper under section 3-804 given "plaintiff's inability to produce the original check"); *Citicorp Int'l Trading Co., Inc. v. Western Oil & Refining Co., Inc.*, No 88 Civ. 5377, 1991 WL 4502, at *3 (S.D.N.Y. Jan. 16, 1991) (holding that, notwithstanding the fact that defendants had admitted they signed a copy of the note, "[a] holder's inability to produce the original note will prevent it from collecting, unless it can establish that the original note has been lost, destroyed or stolen.").  *See also* N.Y.U.C.C. § 1-201(20) (requiring possession of instrument to qualify as holder). Although the court in *Cavendish Traders* analyzed "copies of promissory notes" under section 3-307, in that case "the existence of the original writings and the authenticity and accuracy of the copies [were] not disputed."  117 F. Supp. 2d at 399 (internal quotation omitted).  Where, as here, the existence and authenticity of the original note are contested, analysis under section 3-804 is proper.

[95]    *See Consolidated Capital Corp.*, 550 N.Y.S.2d at 805 (holding that where the notes were not issued or endorsed to plaintiff, plaintiff was not a holder) (citing cases).  Because the absence of the original of the Omniway Note forecloses plaintiffs' ability to take advantage of the presumptions to which a holder is entitled, it is unnecessary to evaluate what TPR's rights on behalf of AG Properties would be if it did have the original note.

[96]    *See* N.Y.U.C.C. § 3-302 ("A holder in due course . . . takes the instrument without notice that it is overdue or has been dishonored or of any defense against or claim to it.").  Although neither Genger nor TPR knew that they were in possession of the purported Omniway Note until approximately 2007, the

produced an original of the note, they would not be entitled to holder in due course status and their claims are subject to all defenses raised by Sharon.

### B.   Validity of the Note

Plaintiffs have met their burden of establishing that the original note has been lost and, in fact, have raised the inference that Sharon or his ally Arie Genger may be responsible for the absence of the original note – which Sharon has done nothing to rebut.[97]   As I already ruled during the final pretrial conference, the copy of the purported Omniway Note is admissible for purposes of proving the validity of the original note, and the terms are clear from the copies produced.[98]   It is undisputed

---

records of AG Properties at all times showed that Sharon's investment was made through Lerner Manor, and Genger admitted that he believed that in 2005 when he bought Sharon's shares.

[97]   *See* 12/6 Trial Tr. (Closing Argument of J. Dellaportas) ("Omniway has refused to turn over its files, and we've had all sorts of shenanigans.  And with regard to our electronic files, they were spoliated.").

[98]   Rule 1003 of the Federal Rules of Evidence states: "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  Plaintiffs admit that they do not have the original note.  However, "identical executed copies of the [N]ote have been found in the files of both AG Properties, which was the note holder, and Raines & Fischer, which was the company's outside accountant."  4/10/12 Hearing Tr. at 4.  Sharon has failed to raise a genuine doubt that the copy accurately reflects the original note.

that no payment has been made on the Omniway Note.[99]  Thus, the only question is whether an enforceable promissory note existed in the first place.

### 1.    Validity of the Signature

Sharon argues that no valid, enforceable Omniway Note ever existed because "[t]he purported note is signed with an illegible scrawl, with no identification of the name, title or authority of the alleged signer," and is "incomplete on its face, referring to attached Schedules which are either blank or missing entirely."[100]  Under the N.Y.U.C.C., the owner of a lost instrument "does not have the holder's prima facie right to recover under the section on the burden of establishing signatures."[101]  Thus, as the parties claiming under the signature, plaintiffs bear the burden of establishing the signature, without the benefit of the presumption of validity.  The fact that the signature is a single illegible scrawl, with no title or written name indeed raises questions as to the validity of the signature.

---

[99]    The purported Omniway Note contains a valid waiver of the right to demand notice of non-payment and such waivers are enforceable.  *See* PX 8 (2/6/02 Signed Promissory Note from Omniway Limited (without schedules) from Raines & Fischer Files); *Cavendish Traders*, 117 F. Supp. 2d at 399.

[100]    Def. Mem. at 2-3.

[101]    N.Y.U.C.C. § 3-804 (Official Comment).  In contrast, revised U.C.C. Section 3-309, which New York has not adopted, allows a party entitled to enforce a lost instrument both to acquire holder status and to avail itself of the presumptions concerning signatures.

This is compounded by the fact that no resolution on the part of Omniway authorizing the transaction has been produced.[102]  Parnes admitted that had he received the Omniway Note in this form, he would have asked questions.[103]

Even if plaintiffs were entitled to the presumptions under section 3-307, once defendants introduce evidence calling into question the validity of the signature, plaintiffs bear the "burden of establishing the signature by a preponderance of the total evidence."[104]  Plaintiffs established at trial that the former Omniway officers are alive and could be located through a simple Internet search and contacted by telephone,[105] and made much of the fact that Sharon made no attempt to determine the origins of the signature or disprove its validity.  As unfair as it may seem in light of Sharon's evasive behavior with respect to Omniway, in fact, under New York law the burden was on plaintiffs to track down these officials in order to prove that the signature was valid and enforceable.  Plaintiffs have not met their burden.

---

[102]    *Compare* PX 10 (Written Consent of Directors of AG Properties to enter into a shareholders agreement with Omniway, signed by Arie Genger).  *See also* 12/4 Trial Tr. at 261 (Parnes) (acknowledging that in order for a promissory note to have legal effect, you need a board resolution authorizing someone to sign it).

[103]    *See* 12/4 Trial Tr. at 264 (Parnes).

[104]    N.Y.U.C.C. § 3-307.

[105]    *See* 12/4 Trial Tr. at 261 (Parnes).

29

## 2. Evidence that the Omniway Note Was Never Intended to Take Effect

In addition to the questionable signature and absence of written authority for Omniway to enter into the transaction at all, there are other indications that the Omniway Note never became a binding agreement between AG Properties and Sharon (through Omniway). *First*, although the absence of executed schedules does not render the Omniway Note invalid *per se*, the fact that no complete copy of the Note has been produced further weighs against finding that plaintiffs have made the necessary prima facie showing that the Omniway Note was ever fully executed.[106]

*Second*, the evidence at trial demonstrates that during the relevant time period, not a *single* person involved – not Parnes, Fischer, Sharon, or Arie Genger – believed that the Omniway Note had ever been finalized as the vehicle through which Sharon invested in AG Properties. Parol evidence is admissible to establish that an instrument never became a binding agreement.[107] The contemporaneous

---

[106]    *See American Inv. Bank, N.A. v. Dobbin*, 617 N.Y.S.2d 999, 1000 (3d Dept. 1994) (holding *on summary judgment* because "[t]he purported copy of the original promissory note is incomplete" and did not show evidence of execution, "plaintiff has not satisfactorily shown that it has possession of the note upon which it seeks to recover").

[107]    *See Polygram Holding, Inc. v. Cafaro,* 839 N.Y.S.2d 493, 493 (1st Dept. 2007) (holding that "parol evidence may be offered to show that a writing, although purporting to be a contract, is, in fact, no contract at all" and denying

emails demonstrate a universal understanding that the Lerner Manor agreement,

which was executed for the identical consideration set forth in the Omniway Note

and contained the same, albeit backdated, dates of execution, was the vehicle

through which Sharon invested.[108]  In contrast to Omniway, a stock certificate

reflecting the transfer of shares was issued to Lerner Manor.  Finally, all future

transactions, including the accounting and the ultimate buy-out of Sharon's interest,

were undertaken with the understanding that Sharon's entire interest in AG

---

summary judgment because questions of fact existed as to whether note was a "sham transaction"); *Dayan v. Yurkowski,* 656 N.Y.S.2d 689, 690 (2d Dept. 1997) ("the parol evidence offered by the defendant may be considered to show that the note, while valid on its face, was never intended to take effect"); *Greenleaf v. Lachman*, 628 N.Y.S.2d 268 (1st Dept. 1995) (parol evidence admissible to show that note was a "sham" to defeat tax liability).  *See also Belknap v. Dean Witter & Co., Inc.*, 92 A.D.2d 515, 517 (1st Dept. 1983) (an incomplete  contract falls within one of the limited exceptions to the parol evidence rule).

[108]     In contrast to the Omniway Note, the Lerner Manor agreement, while backdated, has no other indicia of invalidity.  It is signed by Lerner, as manager, and stamped with the company's registration.  The note is complete.  Furthermore, the fact that it is backdated, including one date which says "as of" February 6, 2002, is consistent with the explanation "that the parties had an initial oral agreement that was to be converted into writing at a later date . . . and backdated to reflect the actual date on which the agreement became effective."  *Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.* 419 Fed. App'x 41 (2d Cir. 2011).  While the backdating is one of countless red flags raised regarding the Canadian Venture as a whole, this case is not about the validity of the Canadian Venture.  *Cf. United States v. Treacy*, No. 08 CR 0366, 2008 WL 4934051 (S.D.N.Y. Nov. 19, 2008) (While backdating is not always illegal, "[i]f the activity in question amounts to a scheme to deceive, irrespective of its legality, it may be violative.").

31

Properties was held through Lerner Manor. Ultimately, even if plaintiffs were entitled to the various rebuttable presumptions of validity set forth in the N.Y.U.C.C. there is simply too much evidence that the Omniway Note was never finalized to support a finding that plaintiffs have established the existence of a valid note. Because plaintiffs have failed to carry their burden, it is unnecessary to address the defendant's affirmative defenses.

## IV.   CONCLUSION

For the foregoing reasons, and notwithstanding my reservations about permitting Gilad Sharon to benefit from his own duplicitous conduct and lack of transparency throughout the Canadian Venture and at this trial, I find for defendant on the issue of the enforceability of the Omniway Note. The Clerk of the Court is directed to enter judgment in defendant's favor and to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 20, 2012

32

**-Appearances-**

**For Third-Party Plaintiffs:**

John Dellaportas, Esq.
Evangelos Michailidis, Esq.
Duane Morris, LLP
1540 Broadway
New York, New York 10036
(212) 692-1000

**For Third-Party Defendant:**

William B. Wachtel, Esq.
Julian D. Schreibman, Esq.
Elliot Silverman, Esq.
Wachtel Masyr & Missry LLP
One Dag Hammarskjold Plaza
885 Second Avenue, 47th Floor
New York, New York 10017
(212) 909-9500